JON M. SANDS
Federal Public Defender
**CYNTHIA YIALIZIS #030978**
407 W. Congress St., Suite 501
Tucson, AZ 85701
Tel. 520-879-7500
cynthia_yializis@fd.org
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR24-03563-TUC-SHR (BGM) |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| vs. | |
| Guillermo Sebastian Carrillo, | |
| Defendant. | |

Guillermo Carrillo, by and through undersigned counsel, respectfully submits the following Sentencing Memorandum for the Court's consideration. Gullermo is respectfully requesting a sentence of probation.

**SENTENCING MEMORANDUM**

Guillermo's surname is that of his mother, Laura Carrillo. Guillermo's father was a Carrasco. Guillermo does not remember, nor does he care to know the first name of the man who left Laura and their young children alone when Guillermo was too young to form any meaningful memories, let alone a connection. Guillermo cannot even remember his father's face. After Guillermo's father left, Laura had to work full time cleaning houses to support her young children. Despite her hectic schedule, Guillermo recalled her being very present. He has memories of going with her to houses while she cleaned, and

of her being home every minute she was not at work. Guillermo's grandmother was also very involved with the family and would take care of the children when Laura could not. Guillermo thus always had a positive adult present in his life and never felt neglected or wanting for anything emotionally. To the extent that he felt abandoned by his father, Guillermo never showed it.

Guillermo's fatherless childhood is not unlike most young men caught up in the criminal justice system. He stands apart from many of these men because he did not run to the streets to find acceptance from men in the wrong places. He did not start to abuse heavy drugs, having had nothing more than a weekly marijuana habit (not necessarily atypical of a teenager/young man). He managed to maintain a strong head on his shoulders and did not succumb to depression and/or anxiety. Some of this can be attributed to the fact that Guillermo was not abused and did not suffer any trauma as a child. Much of it is a testament to Guillermo's mother and how she raised her son.

Guillermo's love and respect for his mother is palpable. Which is why it was beyond tragic and heartbreaking when her life was unexpectedly cut short in a car accident when Guillermo was around 18 years old. In the blink of an eye, Guillermo lost the most important person in his life. After Laura passed, Guillermo dropped out of school so that he could work and take care of his siblings. He had, in his own words, "to be strong for them."

Laura's death was one of the first things Guillermo shared with undersigned counsel, and it was evident that he was still grieving her loss. When asked how he had processed this tragedy, Guillermo downplayed it, stating that he was fine because he

needed to be strong for his family. These words were a clear contradiction to the tears welling in Guillermo's eyes and the tremor heard in his voice.

*The ultimate measure of a man is not where he stands in moments of comfort and convenience, but where he stands at times of challenge and controversy.*
*– Martin Luther King Jr.*

Guillermo's story begins anew on May 22, 2024 - the day he was released from custody. This date marks the beginning of a journey that has revealed the pure and resilient character of this young man.

Guillermo was only 20 years old, and he was released with the condition that he reside at Dismas Charities, a residential reentry center. He barely spoke a word of English and had never lived away from his home and family in Mexico. At that time, he had no one in Tucson. For these very reasons, Guillermo's release was objected to by the Government, with the concern that with nothing here – no ties, no resources, no nothing - he would just go back to Mexico.

Dismas houses a variety of characters, many of whom have a record and/or come from very broken backgrounds. There are men who have already been through the system and are struggling with their own challenges to stay sober and/or to disassociate from a criminal lifestyle. It can be a scary place for a 20-year-old who has never lived in the United States and cannot speak the language. The concern that Guillermo would run back to Mexico thus had some validity.

Running was never an option for Guillermo. From the get-go, he acknowledged the gravity of his situation and the need to make amends for his actions. In accordance with that, Guillermo made the conscious decision to keep his head down, stay away from

negative influences, and get a job with the goal of saving money for his family. In Guillermo's letter separately submitted to this Court, he writes:

> *I started working in the kitchen at Dismas after a month to show that I wanted to work so that I could get a job. I wanted them to know that I was not there to just lie down. In addition to working, I also helped with tasks around Dismas, like cleaning the rooms, mopping, and things like that. About four months after I got there, another resident offered me his job with Brightview Landscaping because he was leaving.*

Every time undersigned counsel met with Guillermo at Dismas, he was in uniform, having just returned from work, or having taken a break to accommodate the meeting. In October 2024, just a few months after Guillermo started his position at Brightview, undersigned counsel received a gratitude letter addressed to Guillermo's employer, a copy of which has been submitted to this Court. Guillermo and his colleague were acknowledged for coming to the aid of a 90-year-old resident at Sabino Mountain Community, who had taken a fall on the sidewalk. After the fall, Guillermo "immediately sprang into action to assist her." Guillermo and his colleague stayed with the resident until her daughter could arrive to assist. They then helped transport the resident safely to her car. The letter ended with the following sentiment: *Thank you for hiring such wonderful individuals who are truly the best additions to our Sabino Mountain Community.* Guillermo is still employed at Brightview and has since been promoted to a crew supervisor, managing a team of four.

In addition to working, Guillermo is studying with a tutor to learn English. Having seen the opportunity to be independent and make a good life here in the United States, Guillermo appreciates the importance of learning the language to broaden his future

earning opportunities. He reports that he supervises a couple of individuals who don't speak Spanish, and this has motivated him more to learn English.

On January 24, 2025, Guillermo's younger brother, Mateo, came to Tucson from Nogales. It was Guillermo's idea for Mateo to come so that he could have more independence and economic opportunities. Guillermo writes:

> *I decided to bring my brother here before I had to do any time on this case so that I could help him learn how to do things on his own and get him out of Nogales. He came to Tucson on January 24. He is doing well and able to buy things for himself for the first time in his life. I plan on helping him get his driver's license. He failed his driver's exam last week and I have encouraged him to keep studying.*

Another unexpected, but very positive development for Guillermo while on release is that he has devoted more time to his faith. Approximately six to seven months ago, Guillermo discovered the Centro Evangelístico Cristiano Church.[1] Guillermo has taken to this congregation because it has an emphasis on many of life's major challenges, including grief. The teachings have brought Guillermo a sense of peace and closure with respect to his mother. Guillermo was finally able to recognize that he had not taken the time to process her death, and he reports feeling at peace with the belief that there is more after death and she is not alone. The church offers a bible studies course that Guillermo hopes to enroll in so he can deepen his connection with his faith.

---

[1] Guillermo was mistaken when he characterized this church as a Jehovah's Witness congregation. *See* Draft Presentence Report ¶ 39. The Church is relatively new and undersigned counsel helped Guillermo uncover his error.

*Circumstances of the Offense*

When Guillermo was arrested on May 15, 2024, he cooperated with agents and disclosed many details about what had transpired leading up to the offense.

On May 13, 2024, Guillermo was hanging out with two individuals he was friendly with from work. Guillermos' brother, Nicholas, had some drama with one of them and had been accused of stealing that individual's girlfriend. While Guillermo was hanging out with them on May 13, they were approached by three individuals he had never seen before. One of them was armed. These individuals told Guillermo that he would have to drive to Food City in Nogales, AZ to pick up some items to drive back into Mexico. They told Guillermo, in a threatening manner, that they knew where his grandmother lived. Guillermo had no reason not to believe them because his two friends, who by now were clearly connected to these three individuals, had been to his house.

Guillermo disclosed that he believed in the threats because he had heard his friends talk about cartels and had seen them with firearms before. Guillermo advised undersigned counsel that his relationship with those two was very casual. He would smoke marijuana with them once, maybe twice a week, and that was it. Guillermo believed that they asked him to do this out of retaliation for his brother's actions, and because they knew Guillermo was a U.S. citizen who frequently crossed the border.

Guillermo's account is corroborated by the fact that he was not paid, that the ammunition was not hidden well in the vehicle, and that he literally said "thank you for catching me" to the agent when he was detained. There is no other evidence to suggest that Guillermo had any information or knowledge about the scope and structure of the

criminal activity, let alone any decision-making authority. He literally stood to benefit nothing but from the perception that his family would not be harmed.

Guillermo's remorse is sincere and expands beyond his own sphere. He writes:

> *I feel very guilty for having done things in the wrong way. My soul came back into my body when I was caught at the border. Knowing that those bullets would have ended up causing harm in Mexico - Knowing that they are a real threat, it gave me real relief that I was stopped and that wouldn't happen. I knew they would wreak havoc and cause great harm to other people. I still feel relief and thankfulness getting caught because I know that those bullets did not cause harm.*

*Age at the Time of the Offense*

Guillermo's age at the time of the offense deserves significant consideration in determining an appropriate consequence. At 20 years old, Guillermo's age was (and continues to be at 21 years old) in the lower end of the age range for the emerging adult demographic, which has been defined as between 18 and 29 years of age. See Arnett, J.J. (2014). Emerging Adulthood: The Winding Road from the Late Teens Through the Twenties, Second Edition. Oxford University Press.

There has been a growing body of research supporting the conclusion that the cognitive skills and emotional intelligence marking the transition from childhood to adulthood may not fully develop until a person's mid-20's. See https://www.americanbar.org/groups/criminal_justice/resources/magazine/2024-winter/americas-recent-attempts-apply-research-policies-practices/; citing Nat'l Acad. Sci., Eng'g & Med., The Promise of Adolescence: Realizing Opportunity for All Youth (2019); Catherine Insel et al., Ctr. for Law, Brain & Behav., Mass. Gen. Hosp., White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys, and Policy

Makers (2022). Traits associated with adolescents, including risk-taking, impulsiveness, reward seeking behavior, and susceptibility to peer influence, are prevalent in emerging adults too. Id. The American Academy of Pediatrics (AAP) released guidelines in September 2017, whereby it raised the recommended age limit of care from age 21 because it is "increasingly clear that the age of 21 years is an arbitrary demarcation line for adolescence because there is increasing evidence that brain development has not reliably reached adult levels of functioning until way into the third decade of life." Id, citing Amy Peikoff Hardin et al., 140 Pediatrics e20172151, Age Limit of Pediatrics, (2017).

Given the growing body of research and awareness, there has been an increasing number of jurisdictions contemplating raising the upper age of juvenile jurisdiction and/or adopting changes to how 18- to 25-year-olds are treated in the criminal justice system. For example, Massachusetts is campaigning to raise the age of adult criminal jurisdiction to 21 years, acknowledging that "exposure to toxic environments, like adult jails and prisons, entrenches young adults in problematic behaviors, increasing the probability of recidivism." See https://www.cfjj.org/emerging-adult-justice. San Francisco developed a Young Adult Court in 2015 specifically for individuals aged 18 to 24 years in recognition of the fundamental differences between this group and juveniles and older adults. See https://sf.courts.ca.gov/divisions/collaborative-courts/young-adult-court.

It should be considered that while development makes an emerging adult more vulnerable and less culpable of criminal behavior, it also makes them more malleable and amenable to positive influence, intervention, and rehabilitation.

Guillermo's actions were driven by fear, but his youth contributed to the extent that he impulsively agreed to do what he did without considering other options. That Guillermo's youth also makes him more malleable and amenable to positive influence, intervention and rehabilitation could not be any clearer given his actions on release.

**CONCLUSION**

This offense was clearly an aberrant act on Guillermo's part. There was no significant planning, it happened quickly, and he conveyed relief upon getting caught. That it is aberrant is further demonstrated by the fact that Guillermo has led an otherwise law-abiding life and has taken significant steps towards rehabilitation on his own.

Probation's recommendation that Guillermo pay a fine because he has some positive cash flow, while simultaneously recommending a prison sentence of 12 months and a day, makes no sense. Guillermo will inevitably lose the job that has enabled him to have a positive cash flow, and his future employment prospects after a prison sentence are frankly unknown.

The fact that a fine has been recommended in this case at all is really just telling of Guillermo's accomplishments. The reality is that most defendants cannot demonstrate the means to pay any fine. That Guillermo has accomplished this in just a year and a half, starting from nothing, is further testament to his character and why he should be placed on probation.

Given everything, there is little reason to believe that probation would not be sufficient to deter, punish, protect, and promote respect for the law. If anything, it will help ensure that Guillermo stays on the solid path he has paved for himself. The toxic environment of prison will only serve as a major setback for both Guillermo, and the community at large.

In addition to requesting probation, it is respectfully requested that a fine is not imposed. Guillermo's positive cash flow is minimal, and he reports that some of his extra cash goes to his family in Mexico. Guillermo has also expressed that regardless of what happens, he wants to get a GED and study for a commercial driver's license. Any excess take home pay he receives would thus be better served towards schooling for those goals, or to have for emergencies to avoid any future setbacks.

It is respectfully requested that the Cout consider Guillermo's history and characteristics, the circumstances of the offense, family support, and Guillermo's exceptional efforts on pretrial release to grant a downward variance and impose a sentence of probation. Guillermo is not a danger to the community and has in fact become an asset as a direct result of his appreciation for the gravity of his actions.

RESPECTFULLY SUBMITTED:    December 11, 2025


/s/ Cynthia Yialis
CYNTHIA YIALIZIS
Assistant Federal Public Defender

10